J. Robert Lynch, J.
The petitioners Central New York Bridge Association, Inc. (Central N. Y.) and Upper New York State Regional Conference, Inc. (Regional Conference) and the respondent American Contract Bridge League, Inc. (ACBL) are New York not-for-profit corporations. The petitioners, sibling organizations of the respondent, have brought a proceeding under article 78 of the CPLR to set aside a resolution of the respondent’s board of directors for being arbitrary, capricious and ultra vires. The respondent ACBL moves now for summary judgment.
Since it was not raised as an issue, we shall not consider whether a decision of the board of directors of ACBL is a determination of a “ body or officer ’ ’ which may be reviewed under article 78 (but, see, 8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7802.01).
The petitioners’ argument seems to confuse ultra vires with arbitrariness and capriciousness by saying that, because an action is ultra vires, it must be arbitrary and capricious even though it otherwise would not be. Actually they are different types of invalid action.
In a claim of arbitrariness and capriciousness, which may be asserted through article 78, the petitioners must make a factual showing that the hoard of directors has acted “ contrary to natural justice ’ ” or “ inconsistent with ‘ fair play ’ ” (Matter of Posner v. Bronx County Med. Soc., 19 A D 2d 89, 93). Otherwise they are “ hound by the decisions, interpretations, rules and laws of the national organization, and that in the absence of fraud or corruption the courts will not interfere in the internal affairs of membership corporations. Organizations have the right to govern themselves within the framework of their constitutions.” (New York State Soccer Assn. v. United States Soccer *273 Assn., 18 Misc 2d 112, 116). “ The question for the court is not whether, passing upon the evidence as res nova, it would have reached the same conclusion as that of the board of managers * * * but simply and wholly whether the case was so bare of evidence to sustain the decision that no honest mind could reach the [same] conclusion” (People ex rel. Johnson v. New York Produce Exch., 149 N. Y. 401, 414; see, also, Madden v. Atkins, 4 NY 2d 283, concurring opn., p. 297).
Whether a corporation’s actions are arbitrary and capricious or not, they may still be in excess of its granted powers, that is, ultra vires, and this may be asserted in opposition to them (Not-for-Profit Corporation Law, § 203). Whether the assertion must be made by application for injunction, as the section would seem to indicate, or by article 78, is beside the point here. Either way, without supportive facts to the contrary, a corporation’s acts are presumed to be valid (Chautauqua County Bank v. Risley, 19 N. Y. 369).
ACBL, the parent organization, was formed to promote the jplaying of competitive bridge among its individual members and to provide them a ranking of their skill through a system of point awards at recognized tournaments. It operates through separately chartered “Units” to which it assigns territorial jurisdiction, with each ACBL member belonging to the unit within whose territory he resides.
The petitioner Central N. Y. is a chartered corporation composed of the ACBL members resident in the latter’s Unit 112, a geographical section running north and south through the center of New York State. Its eastern boundary runs roughly from where the Delaware enters Sullivan County to where the St. Lawrence enters Franklin County. Its western boundary excludes the Counties of Niagara, Erie, Chautauqua, Cattaraugus and Allegany. Its certificate of incorporation recognizes its subservience to ACBL’s authority.
The respondent ACBL’s by-laws provide for contiguous units being grouped into “ Districts ”, each district to contain at least 4,000 ACBL members, and each district to supply one representative who collectively constitute ACBL’s board of directors. For some time past Unit 112 (Central N. Y.) has been a part of District 2, an area including most of the Province of Ontario and all of New York north iof the Sullivan-Ulster-Columbia County line, excluding Chautauqua, Cattaraugus and Allegany Counties.
Historically ACBL has encouraged inter-unit bridge tournaments (in fact they are necessary for advanced status as we shall *274 see), and this prompted the formation of the petitioner Regional Conference. This corporation’s members belong to ACBL and thus to some unit, either in or around Unit 112. It holds tournaments in and outside of Unit 112, specifically in Albany, Schenectady, Syracuse, Rochester, Binghamton and Buffalo. Such regional organizations as Regional Conference are recognized by ACBL’s by-laws and Regional Conference’s certificate of incorporation acknowledges the hegemony of ACBL.
To maintain equal representation on its board of directors, ACBL’s by-laws require that every five years it must review and adjust the grouping of units into districts and, by extension, adjust the territorial jurisdiction of units, if that be necessary. Its redistrictirig committee commenced such a review in 1970, and, in July, 1971, presented a redistricting plan to the board of directors. The plan broke up old District 2 and, in doing so, divided old Unit 112.
The new plan made a new District 2'composed of units located wholly in Canada. Niagara and Erie Counties, formerly in old District 2 but not in old Unit 112, were put in a new District 5. Monroe, Orleans, Gfenesee, Wyoming and Livingston Counties were taken from old Unit 112 and were also put in new District 5. The balance of old Unit 112 remained intact and was put in a new District 4.
New District 5 was to consist of western New York, western Pennsylvania, eastern Ohio, northern West Virginia and the panhandle of Maryland. New District 4 would be composed of central New York from north to south, eastern Pennsylvania, southern- New Jersey, and all of Delaware.
Considering the huge size of the Province of Ontario compared with these small eastern States, we suspect that each of new Districts 4 and 5 is much smaller in area then old District 2. Certainly the new districts are more equitably proportioned in ACBL memberships, even though the new Canadian districts may not reach the average size. But the petitioners were not happy with the new deal, and with some underlying justification. The redistricting made them remote in their district from the center of bridge activity, which will now be located in Pittsburgh in new District 5 and Philadelphia in new District 4. In old District ,2, they were in the center of activity, the Buffalo-Rochester-Syracuse-Albany axis.
The court tends to sympathize with the petitioners because we have seen other reapportionments made from map outlines which ignore historic traffic-flow patterns. The petitioners argue with considerable persuasion that in their area customary *275 travel is east and west, not north and south. ("W e can imagine, though, that for years the Toronto and Ottawa members of old District 2 were making the same argument in vain.) But justifiable unhappiness with a given result is not to say that it is contrary to natural justice, inconsistent with fair play, fraudulent or corrupt.
When the redistricting plan was presented to ACBL’s board of directors, the petitioner Central N.Y. did not throw in its hand and concede the game. It voiced its dissatisfaction by having its representative, one of its officers who is a New York attorney, appear and object in detail. He asked that old Unit .112 be kept whole, and, if not put in a district entirely within New York State, that it be put in new District 5. The board of directors considered the objections, overrode them, adopted the redistricting committee’s plan, but made a concession by adding that the new plan would not affect the petitioner Regional Conference’s tournaments nor the validity of points that could be won at them.
Central N.Y., now joined by Regional Conference, pressed its objections and, to hear them, ACBL, according to its procedure for such matters, convened an administrative board of review. After a hearing on January 22, 1972, the objectors and the review board agreed: that the review board would recommend to the ACBL board of directors at its next meeting, which would commence on March 13, that old Unit 112 should remain intact and be put in new District 4 (not 5); that the objectors would present this recommendation for their members’ approval on February 14, and report their decision as soon after that as possible.
The ACBL board of directors commenced its meeting on March 13 with no word from Central N.Y. and Regional Conference. On March 14, still no one had heard, and so the review board made its recommendation anyway. Despite the recommendation (or perhaps because the board of directors had not heard any approval of it from the petitioners) the board on March 14 reaffirmed its approval of the redistricting plan, again with the saving clause for Regional Conference’s tournaments.
On March 15, the chairman of the redistricting committee, who was also a member of the ACBL board of directors, received a letter, postmarked March 10, from the representative of Central N. Y. and Regional Conference. In effect the letter rejected the board of review’s proposal that old Unit 112 be put in new District 4, by reiterating the demand that the unit be kept intact and be put in an all-New York district or in new District 5. (In *276 the letter the petitioners also demanded that ACBL “ amplify and formalize ” its position favoring continuance of Regional Conference and waive the application of the McConnell-Rubin Formula ”. Since we have not been told how the petitioners wanted the position amplified and formalized, or what the McConnell-Rubin Formula is, we assume that we were meant" to ignore this demand in this proceeding.)
On March 16 the redistricting committee met in special session and prepared a report to the ACBL board of directors. It stated: that there was no present reason for the board to amend its previously taken action; that the board should charter a new unit (provisionally if necessary) to give effect to its previously taken action; that the board of directors should, at its meeting in the summer of 1972, consider the application of Unit 112 to remain intact and be placed in new District 5. The redistricting committee’s report was adopted by the board of directors.
Following this the petitioners commenced the article 78 proceeding by show cause order of this court which stayed the respondent ACBL from carrying out its redistricting plan pending resolution of the controversy. Some of the petitioners’ trump were finessed, however, by the action of the respondent’s board of directors at its 1972 summer meeting. There it rescinded its splitting of old Unit 112 and adopted the recommendation of the board of review that it be placed in its entirety in District 4, this to take effect if and when the court’s stay is lifted. With that done, the respondent brought on this motion for summary judgment to dismiss the proceeding.
The relief they have been given by ACBL is not the relief the petitioners want. True they have been kept intact, but they also seek to be put in an all-New York district or in new District 5. The reasons they feel that ACBL has treated them in an arbitrary, capricious and ultra vires manner, are alleged in their petition.
To understand the first of their complaints, one must know the ACBL members can only accumulate “red points ”, which lead to ‘ Life Master ’ ’ ranking, by winning them at tournaments above the unit level, that is, in regional or national tournaments. The petitioners allege that their members have maintained their membership, some as long as 30 years, only because regional red-point tournaments were available to them in nearby cities, such as Albany, Syracuse or Buffalo. They claim a. ‘ vested right ” in the continuance of such tournaments. Whether they have a vested right or not, this complaint has been eviscerated by ACBL’•& conceding continued existence to Regional Confer *277 erice’s purpose: “ Nothing in this action shall be deemed to affect the existence of Upper New York State Conference. In fact, the Board considers the continued existence of this Conference desirable to implement the allocation of red point sessions to the area in question ”.
Another complaint is that ACBL was arbitrary and capricious in not following the recommendation of the administrative board of review to keep Unit 112 intact and put it in new District 4. This is academic now that ACBL has voted to follow the recommendation. In so holding we overlook the reality that, throughout the prelude to this proceeding, it was the petitioners who were contesting this solution.
The decision to keep Unit 112 intact and grant efficacy to Regional Conference also renders academic the other complaints that breaking up the petitioners was arbitrary and unreasonable.
There is one more complaint: that the redistricting plan, as it affects the petitioners, was motivated solely by the desire of ACBL to put Canadian units in all-Canadian districts; that ACBL’s sanctioning even Canadian units, to say nothing of Canadian districts, is ultra vires, beyond ACBL’s authority. In short, the petitioners assert that ACBL is authorized to act only in the United States of America.
The reasoning behind this complaint is disclosed by the linked allegation that, if ACBL had not been motivated to segregate the Canadian units, Unit 112 could then have been placed in an all-New York district and failure of the ACBL to do this was arbitrary and unreasonable. There are no facts supplied to support this leap in logic.
Let us assume that ACBL was not motivated to segregate the Canadian units and the petitioners are correct that their sanctioning is ultra vires. The petitioners have not shown that the result would have been any different than what it is, that Unit 112 would go either into District 4 or District 5, neither of them all-New York. Trying it the other way and assuming that ACBL was not motivated to segregate the Canadian units and their sanctioning is not ultra vires: — the petitioners have not shown that they would still not be in old District-2. That was not all-New York but included most of the Province of Ontario. So, to say that, if ACBL had not been motivated to segregate the Canadian units, it would have put Unit 112 in an all-New York district, is an unwarranted conclusion. To say that it could have, is only to state a possibility, a frustrated desire. Absent facts, it does not condemn the contrary as arbitrary or unreasonable, especially since both petitioners acknowledge ACBL’s authority *278 over territorial jurisdictions, and ACBL was acting to accomplish a proper corporate purpose, proportionate representation on its boarql of directors.
The ultra vires complaint, then, no matter how it is resolved, cannot give the petitioners an all-New York district, nor even restore old District 2. Nonetheless, we see no reason why members of a corporation, with nothing personally at stake, cannot protest their corporation’s acts as being ultra vires solely for an altruistic reason, simply because they do not want their corporation to act extra-legally. Therefore, we shall consider the argument.
ACBL, being a New York not-for-profit corporation, must be •managed by its board of directors (Not-for-Profit Corporation Law, § 701) which is given all the “ powers necessary to effect any or all of the purposes for which the corporation is formed ” (Not-for-Profit Corporation Law, § 202, subd. [a], par. [16]). While the board of directors is given broad discretion to act within its powers, these may be restricted by statute, the certificate of incorporation or by by-laws (12 N. Y. Jur., Corporations, §§ 585, 586). Actions beyond the restrictions are said to be ultra vires. (See Words and Phrases,- ‘‘ Ultra Vires ”.)
The petitioners claim that ACBL’s sanctioning of Canadian units is ultra vires because its certificate of incorporation declares it to be a “ national organization ” whose relationship internationally is only to ‘ ‘ cooperate with other bodies of similar character in other countries for mutual legislation and the conduct and government of international competitions ”. There is no doubt that ACBL has indulged for years in substantial corporate action in Canada (and also in Mexico and the- Bermudas; see 'Matter of Stone [American Contract Bridge League], N. Y. L. J., March 6, 1959, p. 13, col. 1). But the question is to be determined, not by an estoppel of history, but by the statutes, certificate and by-laws.
The enabling statute does not restrict New York not-for-profit corporations to operating in New York or in the United States. Bather, it permits one ‘ to conduct the activities of the corporation and have offices and exercise. the powers granted by this chapter in any jurisdiction within or without the United States ” (Not-for-Profit Corporation Law, § 202, subd. [a], par. [11]; italics supplied).
Looking at the certificate, we notice first that the corporation is not the United States Contract Bridge League but the American Contract Bridge League. Surely the petitioners are not among those provincialists who would exclude every country *279 in the western hemisphere from being American except the United States.
Next the certificate contains that clause requiring co-operation with similar bodies in other countries. We take this to mean that if there are any other bodies of at least the same scope, as distinguished from merely local ones, ACBL should co-operate with them. We cannot stretch this language to mean that ACBL should not operate in a country that has not been shown to have a similar body.
There are two “ national ” references in the certificate of incorporation, both of them in the purposes clause:
“ (f) To constitute an authoritative national organization for the final determination of all questions which may arise in the play of the game * * *
“ (i) To conduct nation-wide ‘ National bridge parties’ with the object of realizing funds to be devoted to some humanitarian cause. ’ ’
If a literal construction of the word ‘ ‘ national ’ ’ is demanded, then, since ACBL may operate by law in any Nation, why should we restrict it to mean this Nation? Why should it not refer to any Nation in which ACBL might operate? Why should this not mean that it is ACBL’s purpose to be a national authority in, say, Canada, or to give Nationwide fund-raising parties in Mexico or the Bermudas? Actually we do not believe that “national” in the corporate purposes was meant to be taken quite so literally. When we consider that ACBL was to operate through a hierarchy of territorial jurisdictions beginning at the local level, we believe the word ‘ national ’ ’ was meant to denote the highest hierarchical level. Either way, it is clear that it was not meant to be a territorial limitation.
There is another reason why we cannot accept the draftsmanship of the corporate purposes as an indirect expression of the territory in which the corporation was to operate. Because the certificate states it directly: ‘ ‘ The territory in which its operations are principally to be conducted is the United States of America” (italics supplied). At the risk of belaboring the obvious, we point out that ‘ principally ’ ’ does not mean ‘ ‘ exclusively ’ ’. There is no contention that ACBL is operating principally somewhere other than in the United States.
ACBL’s by-laws make membership open to all, without restriction of country of residence or citizenship, and they are likewise free of any language which would suggest that its-operations were confined to the United States.
*280 In consequence we- find that there is nothing in the statutes, certificate of incorporation or ACBL’s by-laws which would forbid the exercise of the board of directors’ power to sanction Canadian units or districts.
We must conclude: that there has been no showing that ACBL has acted contrary to natural justice, inconsistent with fair play, fraudulently or corruptly; that its actions were within the frameAvork of its constitution; that this court cannot interfere with its internal ■ management.
The article-78 proceeding presents no issue of fact. Summary judgment dismissing it and lifting the stay order must be granted.